# Illinois Official Reports

## Appellate Court

---

### *Pearson v. Pilot Travel Centers, LLC*, 2020 IL App (5th) 180505

---

| | |
|---|---|
| Appellate Court Caption | REONA PEARSON, Plaintiff-Appellee, v. PILOT TRAVEL CENTERS, LLC, a Corporation, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-18-0505 |
| Filed | May 18, 2020 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 16-L-558; the Hon. Christopher T. Kolker, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | John F. Cooney and Justin S. Zimmerman, of Lewis, Brisbois, Bisgaard & Smith LLP, of Edwardsville, for appellant.<br><br>Thomas C. Rich, Michelle M. Rich, and Kristina D. Cooksey, of Rich, Rich, Cooksey & Chappell, P.C., of Fairview Heights, for appellee. |

Panel
JUSTICE MOORE delivered the judgment of the court, with opinion.
Presiding Justice Welch concurred in the judgment and opinion.[*]
Justice Wharton dissented, with opinion.[**]

**OPINION**

¶ 1 This appeal arises out of a negligence and premises liability lawsuit from the circuit court of St. Clair County. The case was tried over a three-day period from July 23, 2018, through July 25, 2018. At the close of the plaintiff's case-in-chief and again at the close of all the evidence, both parties made motions for directed verdicts with the trial court. The trial court denied the parties' motions for directed verdicts on both occasions. Ultimately, the jury returned a verdict in favor of the plaintiff, Reona Pearson, awarding her damages for her injuries against the defendant, Pilot Travel Centers, LLC (Pilot). Pilot filed a motion for judgment notwithstanding the verdict (judgment *n.o.v.*) on September 20, 2018, which was also denied by the trial court.

¶ 2 Pilot now appeals, arguing that the trial court erred in denying its motions for directed verdicts and its motion for judgment *n.o.v.* For the following reasons, we find that Pilot owed no duty to the plaintiff under the circumstances presented in this matter and that the trial court erred in failing to grant Pilot's motion for judgment *n.o.v.* Accordingly, we reverse the judgment and remand with directions that the trial court enter judgment *n.o.v.* in favor of Pilot.

¶ 3                                  I. BACKGROUND

¶ 4 On the evening of April 7, 2016, the plaintiff was working as a waitress at a Denny's restaurant (Denny's) located inside of a truck stop in East St. Louis, Illinois. The truck stop was owned by the defendant, Pilot. Both customers and employees of Denny's had available to them public restrooms located within Pilot's truck stop. Denny's did not have public restrooms of its own. While working her shift, the plaintiff attempted to use Pilot's public restroom around 9 p.m. Upon entering the restroom, the plaintiff headed to the restroom stall she typically used, which was a designated handicapped stall located farthest away from the restroom entrance. As she opened the door and entered the stall, the plaintiff was struck on the top of her head by an industrial-sized roll of toilet paper. There were no other persons in the restroom at the time of this incident, and as a result, there are no witnesses who directly observed this event.

¶ 5 The plaintiff subsequently filed a lawsuit based upon the above event on October 20, 2016, in an attempt to recover for her injuries. The plaintiff amended her complaint twice before filing her third amended complaint, which was filed on July 19, 2018, and is the complaint that

---

[*]Justice Barberis was originally assigned to participate in this case. Presiding Justice Welch, who has been substituted on the panel subsequent to Justice Barberis's recusal, has read the briefs and listened to the recording of oral argument.

[**]Justice Chapman was also originally assigned to participate in this case. Justice Wharton, who was substituted on the panel subsequent to Justice Chapman's retirement, has read the briefs and listened to the recording of oral argument.

is applicable to this appeal. The plaintiff's third amended complaint contained two counts and named Pilot as the sole defendant.

¶ 6     The first count of the plaintiff's complaint was a negligence count, alleging that Pilot was responsible for the injuries the plaintiff sustained from the falling toilet paper for one or more of the following reasons: (1) Pilot failed to manage and maintain its premises, specifically, the restrooms, in a safe condition, (2) Pilot failed to periodically inspect the restrooms for the presence of a hazardous or dangerous condition, (3) Pilot failed to provide a safe ingress and egress to the restroom stall, and (4) Pilot allowed and permitted the premises to become and remain in a hazardous and dangerous condition, which it knew or should have known existed, namely, by allowing an industrial-sized roll of toilet paper to remain on a door ledge to the restroom stall on the premises. The plaintiff further alleged in her complaint that the acts or omissions named previously were the direct and proximate cause of her injuries.

¶ 7     The second count of the plaintiff's complaint was based upon the doctrine of *res ipsa loquitur* and alleged that the toilet paper that caused the plaintiff's injuries was under the management and/or exclusive control of Pilot and that the incident would not have ordinarily occurred absent negligence on the part of Pilot.

¶ 8     On July 23, 2018, just prior to the start of trial, Pilot answered the plaintiff's complaint and denied liability for the incident and the alleged injuries of the plaintiff. The evidence introduced during the trial, which is pertinent to the issues on appeal, is summarized as follows.

¶ 9     Following jury selection and opening statements, the plaintiff was called to testify. The plaintiff testified that she had been employed by Denny's for eight years prior to this incident. On the evening of the incident, the plaintiff was working a 2 p.m. to 11 p.m. shift. Sometime around 9 p.m. the plaintiff attempted to use the restroom. The plaintiff stated that she always uses the women's restroom which is closest to Denny's while she is working. She testified that she headed to the farthest stall, which was the handicapped stall and the one she typically used when it was available. On this occasion, no one else was present in the restroom. As she approached the stall, she was looking straight ahead and moved in a hurried or "fairly rushing" manner. The restroom stall door was slightly ajar. Upon reaching the stall, she opened the door and was struck on the top of her head by a roll of toilet paper. The plaintiff testified she never saw the object before it struck her. She also testified that she did not know exactly where the roll came from or exactly where it was positioned. She further testified that she had no idea why the roll would have been up on the door or how long it would have been up there prior to it falling on her. After gathering herself, she exited the restroom and saw a Pilot custodian, Robert Sayles. She informed him of what had occurred, took him into the restroom, and showed him the toilet paper roll that was lying on the restroom floor. She then reported the incident to her manager at Denny's and filled out an incident report.

¶ 10    On cross-examination, the plaintiff admitted that she believed the roll of toilet paper was an obvious object which she would have noticed if she had been looking up towards the top of the restroom stall door. She further acknowledged that a fair number of individuals used this particular women's restroom throughout a day. She testified that, at the time of the incident, there was no water or trash on the floor and that the lighting in the restroom was appropriate. She also testified that she had never before seen a toilet paper roll on top of the restroom stall door and that she had never had any other employees warn her of such a thing or share with her that they had seen such a thing. She testified that, on one previous occasion, she had noticed a roll of toilet paper lying on top of the stall divider inside of the stall.

¶ 11    Next, Robert Sayles, the Pilot custodian who was on duty the night of the incident, was called to testify. Sayles testified that he had worked for Pilot for a little over 11 years and that it was his responsibility to clean and maintain the restrooms on the evening of the incident. Sayles testified that more than 2500 people use the restrooms daily. He also testified that, on the evening of April 7, 2016, he was the only custodian on duty. Besides cleaning and maintaining the restrooms, Sayles was responsible for numerous other tasks such as stocking and selling ice, waiting on customers outside of the truck stop, maintaining and cleaning the showers, doing the laundry, filling propane tanks, and emptying trash. Sayles testified that his shift that day began around 4 p.m. Sayles stated that during his shift, he never cleaned or inspected the women's restroom prior to the plaintiff being injured.

¶ 12    Before the incident occurred, Sayles received a complaint regarding the men's restroom near Denny's. It was common for staff at Pilot to get complaints when something was out of order or in need of cleaning in the restrooms. While cleaning the men's restroom, Sayles "was called away because of a spill" elsewhere in the truck stop. While addressing the spill, Sayles left his supply cart blocking the doorway of the restroom with a sign on it that indicated the restroom was closed due to ongoing cleaning. Sayles testified that he left his supply cart in this position while cleaning the restrooms to keep customers out during cleaning. Sometime after being called away or upon his return to the men's restroom, Sayles saw the plaintiff, who asked if she could use the women's restroom. He indicated that she could and told her he had not cleaned that restroom yet because he was still cleaning the men's restroom. Sayles testified that, based upon this interaction, he believed that the plaintiff's need to use the restroom was somewhat urgent. Shortly thereafter, the plaintiff came and told him of the incident and brought him into the restroom to observe the toilet paper roll on the floor. Sayles testified that the toilet paper roll that struck the plaintiff was the same type of toilet paper used by Pilot at the truck stop. Sayles was then asked about where the toilet paper is typically kept. He testified that if everything is where it should be, then the toilet paper would be located in the custodian's supply closet, on the custodian's supply cart, or in a stall toilet paper dispenser. With regard to previous issues with toilet paper at the truck stop, Sayles testified that he had previously seen occasions where the customers had messed with the toilet paper, taken it out of the dispensers, torn up the toilet paper, and left rolls on the floor, the back of the toilet, and the counter. As a result, when he is cleaning, he checks to make sure the rolls are in their proper place.

¶ 13    On cross-examination, Sayles testified that when he was in the restroom with the plaintiff after the incident, he noted that the bathroom was dirty but that there was no overflowing trash. While he did not check all of the restroom stalls, he did check the dispensers in the handicap restroom stall and confirmed that no toilet paper rolls were missing. He also testified that there was no business-related reason for a Pilot employee to place the toilet paper on top of the door. Sayles was then asked if he had ever seen a roll of toilet paper on top of a door in his 11 years of working for Pilot. Sayles replied, "That's weird. No, I never, never, never, never seen that before." He later stated, "I would say it's unusual, very, very unusual, but you know—it's unusual. In my eleven years I never have seen anything like it before. So, yes, sir, it's unusual." He ended his testimony by stating that he had received no complaints about the women's restroom prior to the incident.

¶ 14    The plaintiff next called witness Roshawn Berry, who was one of the Pilot store managers working on April 7, 2016. Berry testified it was her job to supervise the employees at Pilot on the evening of the incident, including Sayles. Berry had worked with Pilot for nearly two years

and testified that Pilot had a company policy of inspecting and cleaning the restrooms every hour. Berry testified that the plaintiff reported the incident to her on that evening and that she had the plaintiff fill out an incident report. Berry could not recall if the women's restroom had been inspected by anyone prior to the incident. She testified that the toilet paper was the same as that used by Pilot.

¶ 15　　On cross-examination, Berry testified that she always uses the same women's restroom that the plaintiff used on April 7. She believed she would have used the restroom sometime that day prior to the incident. She further testified that she had never before seen toilet paper on top of restroom stall doors. She testified that no complaints were made about the women's restroom to any Pilot employees.

¶ 16　　The plaintiff next called Tiffany Powell, another Pilot store manager who was working at the time of the incident. Powell had worked for Pilot for 11 months. She also confirmed that Pilot had an hourly inspection policy for the restrooms. She testified that the truck stop was a busy location and that it had a large number of customers. She testified that the plaintiff also reported the incident to her. She testified that she did not know if the restroom was inspected prior to the incident. She confirmed that if everything is going properly, then the toilet paper rolls would either be in the custodian's supply closet, on the custodian's supply cart, or in a toilet paper dispenser. Powell testified that the custodian's supply cart is accessible to the public at times when the custodian is cleaning the bathrooms or when the custodian is using the cart to close the unfinished restroom while he or she is away. It was her testimony that if someone was so inclined, he or she could steal the toilet paper off of the supply cart.

¶ 17　　On cross-examination, Powell testified that she had never seen toilet paper placed on top of a restroom stall door before in her life. It was her testimony that customers would go in and out of the restrooms every 5 to 10 minutes and that there would never be an hour-long gap in time where a customer was not in the restroom. She further testified that she believed the handicap stall is the most preferred of the restroom stalls by individuals who use the women's restroom. She stated that it was common for unsafe conditions or hazards to be reported by customers to management or Pilot employees. She testified that she believed it was Pilot's responsibility to check if the toilet paper is on top of the restroom stall doors and that she would have noticed it had it been there when she used the restroom.

¶ 18　　Benjamin Fischer, a mechanical engineer and the plaintiff's controlled expert, was next called to testify. Fischer testified that he conducted an inspection of the truck stop premises. Fischer described the size of the roll of toilet paper that was involved in the incident. He testified that the roll was nine inches in diameter, 3½ inches tall, and weighed slightly less than two pounds. According to Fischer, there were only two possible positions that the toilet paper could have been in prior to falling on the plaintiff. He testified that it would have been possible for the toilet paper roll to have been placed on the stall divider inside of the restroom stall. However, from that location, the toilet paper roll would not have fallen merely from an act of opening the stall door. Instead, it was his opinion that someone would have had to have pushed the roll of toilet paper off that ledge, and since no one else was present in the bathroom at the time of the incident, this hypothesis was not probable.

¶ 19　　Fischer then discussed the second possible position, which is that the roll of toilet paper was placed on top of the restroom stall door which was left slightly ajar. He testified that the roll of toilet paper could have been placed on top of the door and that he was able to do so without much difficulty. He also testified that with the roll in this position and door slightly

ajar, nothing appears out of the ordinary as you approach to enter it. Fischer then discussed a demonstration that he conducted where he placed the roll on top of the stall door and then opened the door in a manner he believed to be consistent with someone entering a restroom stall. The result was the toilet paper roll falling from the top of the stall door down towards the path of the individual attempting to enter the stall. He filmed this demonstration, and the video was shown to and discussed with the jury. He testified that, based upon his experience on that day and his observations, the toilet paper was not obvious because "[t]here was very little contrast *** you had a white roll on a beige or a white, very light background."

¶ 20 Based upon Fischer's investigation, it was probable that the toilet paper roll could have been placed on the door and that it could have fallen and struck the plaintiff as she described. Fischer testified that Pilot's expert, Alex Rigoni, did not even consider the second scenario. Instead, Rigoni ended his evaluation of the case after determining the first scenario, with the toilet paper roll on the stall divider, was not probable. Fischer further testified that he was unaware of any business purpose for a toilet paper roll to be placed upon a bathroom stall door. In his opinion, the only reason he believed a roll of toilet paper would be up in such a position would be a prank. After the close of Fischer's testimony, the plaintiff rested her case-in-chief. At that time, both the plaintiff and Pilot moved for directed verdicts. The trial court denied both the plaintiff's and Pilot's motions.

¶ 21 Following the denial of the motions for directed verdicts, Pilot called its first witness, mechanical engineer and Pilot's controlled expert, Alex Rigoni. Rigoni testified that he conducted his investigation of the incident by first inspecting the truck stop and restroom at issue. This inspection included taking measurements and photographs of the relevant areas. He testified that, based upon his investigation, he believed there was no area sufficient to constitute a "ledge" outside of the restroom stall where the roll could have been placed. He then testified that he turned his attention to the ledge created by the dividing wall, between the stalls, that was located on the inside of the handicapped stall. He testified that in his expert opinion, based upon the plaintiff's testimony that he had read from her discovery deposition, it was not possible for the roll to have been located on the stall divider and to have struck the plaintiff in the head. Rigoni's testimony focused on the amount of time it would have taken for the toilet paper roll to fall, the amount of time that it would take the plaintiff to open up the restroom stall door, and the amount of time it would then take for the plaintiff to proceed into the restroom stall. It was his opinion that, based upon these times, there was no way for the plaintiff to have been struck by a falling roll of toilet paper as described because she would have had to pause or slow her speed into the stall in order to open the door before she could proceed forward to the point where she claimed to have been struck in the head.

¶ 22 On cross-examination, Rigoni testified that he had only the plaintiff's discovery deposition available to him to review before conducting his investigation. He denied reviewing any of the other witnesses' testimony. Rigoni testified that he considered a number of hypotheses as to how the incident might have occurred but concluded based upon his calculations of her travel and the speed of the falling toilet paper that she could not have been struck. The plaintiff's counsel then asked, "Would you agree that it would be more probable that a roll of toilet paper resting on the top of the door would be dropped on Reona's head versus on the inside ledge?" Rigoni responded, "I wouldn't speculate. I've never seen anything like this before."

¶ 23 The final witness called was Jamie Abbott, who was the general manager of the truck stop at the time of this incident. Abbott testified that she was not working at the time of the incident

but learned of it once she arrived for her next scheduled shift. Abbott confirmed that Pilot had a policy of checking the restrooms hourly but also testified that it was not uncommon for other more pressing issues to arise which would interfere with that policy. Abbott then testified to the size and nature of this particular truck stop. She testified that this Pilot Travel Center had 28 fuel pumps, parking spots for 202 full-sized semi-tractor trailers, service areas at each diesel pump for diesel exhaust fluid, a CAT weigh scale, propane fill service, 15 showers and 4 restrooms, a Cinnabon station, a deli station, a Denny's restaurant, a fax and transfers station, a money recycler, and a gaming room and lounge area. She testified that approximately 2500 people visited the truck stop on an average day. Abbott stated that she had never heard of an instance where a roll of toilet paper was found on top of a restroom stall door at her location before April 7, 2016. Abbott testified further that she was unaware of any complaints regarding the restroom at issue on the day of the incident. She believed that there was no business purpose for the roll of toilet paper to have been on top of the door. Abbott also testified, "I've worked for the company for 15 years in four different facilities, and I've never seen or heard [of] it."

¶ 24 Abbott also testified that she was unaware as to whether any of the employees on duty checked the bathroom in the five hours prior to the incident. She testified that she could not recall if she asked the team members if they had inspected the restroom or not; all she knew was that no one said that there were any operational problems with the women's restroom or cleanliness problems with the women's restroom that were known on April 7, 2016. She further stated that if she had found anything on the camera system indicating that an employee had inspected the restroom prior to the incident, she would have notified Pilot to pull the footage. Abbott testified that based upon her experience at the truck stop, she thought it was

> "completely unreasonable based on the demands of the business, based on the fact that we do have breaks and lunches that all those team members go on and that they do— are required to go in there and check it when they're there. So I find it very hard to believe that there would be any length of time whatsoever that no one was in there."

¶ 25 Abbott confirmed that the toilet paper that the plaintiff was claiming struck her was the same as that used at Pilot. She also confirmed that the toilet paper should be in one of three places: the supply closet, the restroom dispensers, or the supply cart. She confirmed that it was appropriate for Sayles to have the toilet paper rolls on his supply cart, as he did on that day. She testified that the custodian's supply cart is allowed to be left unattended if another situation arises that requires his or her response. She further elaborated that it would be unrealistic to place the custodian's supply cart back in the supply closet every time something required his or her attention because the supply closet was located on the opposite side of the Pilot from where the restrooms at issue were located.

¶ 26 Following Abbott's testimony, Pilot rested its case. Both parties moved for a directed verdict a second time, and the trial court denied both motions. After closing arguments, the jury was instructed as to the applicable law to be considered when deciding the case. The jury deliberated and returned a verdict in favor of the plaintiff, finding Pilot liable for her injuries. Following the trial, on August 23, 2018, Pilot filed a motion for judgment *n.o.v.* On September 20, 2018, the trial court denied Pilot's motion for judgment *n.o.v.* without stating any specific findings. Pilot filed a timely notice of appeal on October 18, 2018. Additional facts will be provided as necessary in the remainder of this opinion.

## II. ANALYSIS

We begin our analysis with an outline of the applicable standards of review. In order for one to prevail in a cause of action based on negligence, the plaintiff must prove the essential elements of the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury caused by that breach. *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 140 (1990). "It is well established that where a plaintiff has obtained recovery against a defendant based on negligence, a judgment notwithstanding the verdict is required if the defendant did not owe the plaintiff a duty." *Schmid v. Fairmont Hotel Co.-Chicago*, 345 Ill. App. 3d 475, 483 (2003). Whether a duty exists is a question of law for the court to decide, which is subject to *de novo* review. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010). "If the evidence, viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict could stand, a judgment notwithstanding the verdict should be granted." *Schmid*, 345 Ill. App. 3d at 483.

### A. Duty

Pilot argues on appeal that the circuit court erred in denying its motion for a judgment *n.o.v.* because it did not owe a duty to prevent the plaintiff's injuries. "Where no duty exists, the plaintiff cannot recover as a matter of law." *Cooke v. Maxum Sports Bar & Grill, Ltd.*, 2018 IL App (2d) 170249, ¶ 54. It is well settled in Illinois that " 'the concept of duty in negligence cases is very involved, complex and indeed nebulous.' " *Ward*, 136 Ill. 2d at 140 (quoting *Mieher v. Brown*, 54 Ill. 2d 539, 545 (1973)). "Whether a duty exists is also an inquiry shaped by public policy [citations] since we must decide whether defendant and plaintiff stand in such a relationship to one another that the law imposes on defendant an obligation of reasonable conduct for the benefit of plaintiff [citation]." (Internal quotation marks omitted.) *Osborne v. Stages Music Hall, Inc.*, 312 Ill. App. 3d 141, 146-47 (2000).

In determining duty, the first step is to analyze the nature of the relationship of the parties to determine if the "plaintiff and [the] defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436 (2006). If such a relationship exists, then the court must look to policy considerations and certain factors recognized by Illinois courts which are relevant to the existence of a duty. The factors to be considered when determining whether a duty exists or whether an "exemption" should be created are (1) the reasonable foreseeability that the defendant's conduct will result in injury to another, (2) the likelihood of injury, (3) the magnitude of guarding against the injury, and (4) the consequences of placing that burden upon defendant. *Id.* at 436-37; *Ward*, 136 Ill. 2d at 140-41.

### 1. Relationship of the Parties

As to Pilot's relationship with the individual who placed the toilet paper roll and directly caused the plaintiff's injuries, the identity of that individual is unknown. All of the employees who testified that they were present on the day of the incident denied placing the toilet paper on top of the restroom stall door or knowing of anyone else who did. In fact, no witness could articulate a business-related reason for placing the toilet paper in such a position. Further, at the time of trial, the plaintiff did not name any individuals as defendants in her complaint, and she did not make any direct allegations in her complaint that any Pilot employees placed the toilet paper in the position which resulted in her injuries. Thus, without evidence of a Pilot

- 8 -

employee being responsible for the placement of the toilet paper, we must analyze this matter as though the toilet paper was placed by a third party.

¶ 34     We next examine Pilot's relationship to the plaintiff. In general, a landowner has no duty to affirmatively protect persons from harm or the actions of third parties on his property unless there is a "special relationship" between the parties. See Restatement (Second) of Torts § 314A (1965). However,

> "Illinois courts recognize four special relationships which impose a legal duty to warn or protect a person from harm, *i.e.*, (1) carrier-passenger; (2) innkeeper-guest; (3) business inviter and invitee, and (4) one who voluntarily takes custody of another in such a manner that it deprives the person of his normal opportunities for protection." *Lutz v. Goodlife Entertainment, Inc.*, 208 Ill. App. 3d 565, 569 (1990).

¶ 35     In this matter, plaintiff argues that a special relationship did exist between her and Pilot at the time of the incident. The plaintiff argues that she was an employee of Denny's located within Pilot's truck stop. She was not an employee of Pilot, itself. Thus, because Pilot held itself out for business and provided restrooms for the use of the public at the time of the incident, Pilot and the plaintiff stood in the relationship of business invitor and invitee. The plaintiff argues that because Pilot owed a general duty of care to the plaintiff as an invitee, it had a duty to guard against the condition that caused her injuries.

¶ 36     Pilot, in its answer to the plaintiff's third amended complaint, denied the allegations made by the plaintiff relating to the business invitor and invitee relationship. However, after this initial denial, it does not appear in the record if Pilot ever again expressly raised its objection that a special relationship did not exist at the time of the incident, or more fully articulated its reasons for denying the allegations relating to such a relationship in the plaintiff's third amended complaint. Pilot also does not address the issue in its appeal briefs. Additionally, it does not appear in the record that the trial court ever heard arguments on the issue or expressly found that such a relationship existed. Based upon this court's review of the record and the case law relied upon by the parties before this court, it appears that after the denial of the special relationship allegations contained in the plaintiff's complaint, the parties, and perhaps the trial court, moved forward assuming the special relationship existed at the time of the incident between the parties and was applicable to this case.

¶ 37     The fact that this issue was not more thoroughly developed at the trial court level raises serious concern for this court. The general rule, as stated above, is that a landowner has no duty to affirmatively protect persons from harm or the actions of third parties on his or her property unless there is a "special relationship" between the parties. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Thus, if such a relationship is not present, Pilot would not owe a duty to the plaintiff to protect her from the acts of third parties on its premises. In order for a business invitor/invitee relationship to exist, a person must enter or be present on the land of another by express or implied invitation, the entry must be connected with the owner's business or with an activity conducted by the owner on the land, and the owner must receive a benefit. *Gonzalez v. Kennedy Mobil Service, Inc.*, 274 Ill. App. 3d 1077, 1084 (1995). Unfortunately, because this issue appears to not have been adequately addressed by the parties prior to this appeal and Pilot has not addressed the issue in its briefing on appeal, we are unable to properly analyze to determine whether the plaintiff and Pilot would have in fact met the requirements required for the existence of a business invitor/invitee special relationship and must find that Pilot has failed to sufficiently preserve its denial contained within its answer to

the plaintiff's complaint. Thus, we must move forward with our analysis under the assumption that the business invitor/invitee relationship was in existence at the time of the plaintiff suffering her injury.[1]

¶ 38   Section 314A of the Restatement (Second) of Torts discusses these special relationships, including that of a landowner to business invitees, and the general duty to aid or protect which may arise out of them. Restatement (Second) of Torts § 314A (1965). Section 344 of the Restatement (Second) of Torts discusses the specific duty that may arise for landowners when they hold their business or premises open to the public to protect invitees from harmful acts of third persons. Restatement (Second) of Torts § 344 (1965). Section 344 "represents a specific statement of the general rule articulated in section 314A of the Restatement *** that certain special relationships may give rise to an affirmative duty to aid or protect another against unreasonable risk of physical harm." *Marshall*, 222 Ill. 2d at 438.

¶ 39   Section 344 reads as follows:

---

[1]While we continue our analysis under the premise that a special relationship existed due to Pilot's failure to sufficiently preserve the issue, the court must note that it cannot determine with certainty from the facts presently before it whether, in fact, such a relationship was present. This case presents a unique factual circumstance due to the plaintiff's status as an employee of Denny's, located within the premises owned by Pilot, who was on duty at the time of her injury, where Denny's did not have its own restrooms for its employees and customers to use. This court has no information or evidence before it as to what the relationship was between Pilot and Denny's. No lease agreement or purchase agreement has been produced for review. No evidence specifically relating to how the companies coexist in the space is available to us. This leaves us with unanswered questions about what benefit Pilot received from allowing employees and customers of Denny's to use its restrooms, whether Denny's purchased the space from Pilot or leased the space, and whether the restroom issue was addressed in the Denny's lease or purchase agreement, among others.

Illinois case law is clear that certain requirements must be met before an individual can be considered a business invitee. Specifically, here, it is not readily apparent how the plaintiff's use of Pilot's restroom would constitute her being present for "business related activities." Even less apparent is how Pilot benefited from the plaintiff using its restroom. For a proper finding of the plaintiff's status to occur, the agreement controlling the leasing or purchase of the property would need to be reviewed. In factually similar cases, the courts have relied on agreements between tenants and landlords to help determine status. See *Jackson v. Shell Oil Co.*, 272 Ill. App. 3d 542 (1995) (a service station attendant whose employer leased a service station from an oil company was not a "business invitee" of the defendant oil company, for the purposes of his premises liability claim against the oil company for personal injuries sustained as a result of a third person's criminal acts, as the attendant was not the oil company's employee and he was on the premises with the consent of his employer, not the consent of the oil company); see also *Hayes v. Bailey*, 80 Ill. App. 3d 1027 (1980) (under the terms of the lease, a defendant lessee was responsible for maintaining public restrooms that were open to patrons of the restaurant and the defendant had a duty to maintain the restrooms in a reasonably safe condition for the benefit of business invitees of the restaurant). Without any evidence of the nature of the relationship between Denny's and Pilot, we are left to speculate as to what that nature may be and how it could impact the plaintiff's status in this case.

Examining the known facts that the plaintiff worked in the Pilot building for eight years, she used the Pilot restroom as part of her employment with Denny's, and she was on duty at the time of the incident involved in this lawsuit—there was no evidence of her shopping while in the Pilot area of the building—this court has doubts that the plaintiff could fulfill the requirements for a business invitor/invitee relationship to be established.

"A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it." Restatement (Second) of Torts § 344 (1965).

¶ 40    Comments in both sections 314A and 344 further elaborate on the applicable duty, stating that even if a special relationship is present, the duty imposed upon a landowner or property owner is not infinite in scope. Comment e of section 314A of the Restatement (Second) of Torts states as follows:

"The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury. He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate, or to give aid to one whom he has no reason to know to be ill." Restatement (Second) of Torts § 314A cmt. e (1965).

¶ 41    Comment f of section 314A reiterates comment e, stating, "[t]he defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured." Restatement (Second) of Torts § 314A cmt. f (1965). Further, comment f of section 344 states:

"Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection." Restatement (Second) of Torts § 344 cmt. f (1965).

¶ 42    Thus, as highlighted by the above comments, "no duty to protect against [third-party] criminal acts will be imposed unless the incident should reasonably have been foreseen by the owner." *Osborne*, 312 Ill. App. 3d at 147 (citing *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 215-16 (1988)). In other words, the property owner must have either "actual" or "constructive" notice of a dangerous condition in order to impose liability. *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038 (2000). Therefore, it is to the issues of foreseeability and notice that we next turn.

¶ 43                                    2. Foreseeability and Notice

¶ 44    In order for a duty to exist, "[i]t is essential that the incident is not just foreseeable, but reasonably foreseeable." *Osborne*, 312 Ill. App. 3d at 147. In other words, the incident must

be "objectively reasonable to expect, not merely what might conceivably occur." (Internal quotation marks omitted.) *Id.* " 'Where injury results from freakish, bizarre or fantastic circumstances, no duty is present and no negligence claim can be asserted.' " *Id.* (quoting *Washington v. City of Chicago*, 188 Ill. 2d 235, 240 (1999)). The determination of foreseeability must be considered in terms of what the defendant knew at the time of the incident, not what was learned or later discovered. *Cooke*, 2018 IL App (2d) 170249, ¶ 69. Whether a particular incident or injury is foreseeable is ultimately dependent upon the facts and circumstances of each individual case. *Osborne*, 312 Ill. App. 3d at 147.

¶ 45    After reviewing all of the evidence presented in this matter, described in detail above, we find that it was not reasonably foreseeable that a third party would obtain a roll of toilet paper and balance it on top of a restroom stall door so as to booby trap the entryway into the stall in some sort of prank or intentional attack upon the plaintiff. All of the testimony at trial demonstrated that this was the only plausible explanation of what occurred, and no witness had ever seen or heard of this type of injury occurring before. Indeed, Abbott, the general manager for Pilot, stated that she had never seen such a thing, despite working for Pilot for 15 years and in four different locations. The plaintiff herself—who had worked at Denny's for eight years, and thus, had used the Pilot restrooms for eight years—testified that she had never seen the toilet paper in such a position. Further, on the day in question, no complaints were made by any customers with regard to the condition of the women's restroom.

¶ 46    The only evidence that the plaintiff points to in support of a finding of foreseeability is that Pilot had notice that patrons would occasionally pick the lock on the toilet paper dispensers, would take the toilet paper rolls out, and would "mess with" the toilet paper by tearing the toilet paper, leaving pieces on the floor, or leaving the roll itself in places other than the dispenser, such as on the back of the toilet or the sink counter. Pilot employees admitted they were aware of this action and that it was one of the things they would check on when inspecting the restrooms. The plaintiff argues that this knowledge constituted the notice required to impose a duty on Pilot. We disagree. As set forth above, the property owner or occupier must have either "actual" or "constructive" notice of the dangerous condition to impose liability. *Tomczak*, 315 Ill. App. 3d at 1038. Constructive notice may be demonstrated by evidence that the landowner had notice of prior accidents, or "[s]uch notice can be inferred through evidence of *previous, similar accidents*." (Emphasis added.) *Perminas v. Montgomery Ward & Co.*, 60 Ill. 2d 469, 473-74 (1975). While the plaintiff relies on *Perminas* to support her argument that Pilot had constructive notice, we find that case to be distinguishable.

¶ 47    In *Perminas*, the defendant, through its employee, had knowledge of the misuse of the object that caused plaintiff's injury. *Id.* at 472-74. Specifically, it had knowledge that the object was misused in a manner that could cause injury (riding the object like a skateboard) and that the object was displayed near the location in which the object caused the injury (a low shelf near the floor). *Id.* Both of these facts alone would give notice to a reasonable person that an injury could occur. In the case at bar, however, Pilot had only the knowledge that the toilet paper was occasionally removed from the dispenser and placed in areas outside of the dispenser (bathroom floor, sink counter, back of toilet) and that on occasion the toilet paper was shredded or pieces were left on the ground. Those facts do not logically lead a reasonable person to expect that a patron may steal a roll of toilet paper and balance it on the restroom stall door in a manner that would result in the roll falling and striking a patron on the head after she opened the stall door.

¶ 48        Instead, we find this case to be more analogous to *Schmid*, 345 Ill. App. 3d at 476, where a hotel guest was injured when he turned on a vanity light switch that shocked him. The plaintiff presented evidence that the hotel employees were aware that on occasion the vanity light fixtures in the hotel rooms would short out. The defendant argued that it was not foreseeable that an electric short in the light fixtures would pose a danger of an electrical shock at the light switch, and thus, no duty existed. *Id.* at 480-82. The court ruled in favor of the hotel, finding that the plaintiff failed to "present evidence of anyone at Fairmont ever being shocked at the light switch, including other occurrences when the vanity lights short-circuited. Consequently, the electric shock to plaintiff was not objectively reasonably foreseeable to Fairmont." *Id.* at 492. In other words, the hotel's knowledge of previous issues with the flow of electricity to its light fixtures was not sufficient to find it had notice or should have foreseen issues with the flow of electricity to the light switch when no issues regarding light switches were previously known. Similarly, here, knowledge of patrons "messing with" the toilet paper alone is not sufficient for this court to find that Pilot should have foreseen someone using the toilet paper to prank or injure someone by booby trapping a restroom stall.

¶ 49        We find that the plaintiff's argument that Pilot's agents and employees would have discovered the roll of toilet paper if only they had properly followed Pilot's policy of inspecting the restrooms on an hourly basis does not bear on the issue of duty. " '[W]here the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines. Rather, it is the law which, in the end, must say what is legally required.' " *Doe v. Coe*, 2019 IL 123521, ¶ 36 (quoting *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238 (1996)). To the extent that the plaintiff is arguing that Pilot's failure to inspect the restrooms should result in constructive notice being imputed upon Pilot, under the facts of this case, we disagree.

¶ 50        If the condition that causes injury is created by a third person or there is no clear showing of how the condition arose, "liability may be imposed if it appears that the proprietor or his servant knew of its presence, or that the [condition] was there a sufficient length of time so that in the exercise of ordinary care its presence should have been discovered." *Thompson v. Economy Super Marts, Inc.*, 221 Ill. App. 3d 263, 265 (1991). In this matter, where the evidence shows that no Pilot employees knew of the toilet paper being on top of the restroom stall door, no one from Pilot placed the toilet paper on top of the door, no complaints were made to employees regarding the women's restroom, and none of the employees were aware of any missing rolls of toilet paper, there is no actual notice. Thus, we turn to the time element to determine if the condition existed long enough for this court to find that Pilot had constructive notice.

¶ 51        The evidence shown in this case suggests that the toilet paper roll was not present for a significant amount of time. Testimony from Pilot employees indicated that this was a busy restroom that would have been used by patrons on average every 5 to 10 minutes and would have been available to approximately 1250 customers a day (assuming an equal distribution of men and women). In fact, manager Powell testified that there would never be a period of more than an hour that the restroom was not used. When one considers that testimony in light of testimony from the plaintiff and other female Pilot employees that the handicapped stall at issue was the most used and the most preferred stall, the evidence suggests that it is highly likely that the handicap stall was used by a patron within the hour preceding the incident. If the toilet paper had been present for a significant amount of time, logic dictates that another

customer would have been injured or would have noticed the issue and reported it to management. Because the plaintiff failed to establish that the toilet paper roll was on top of the door for a period of time long enough that Pilot should have or could have discovered it, we cannot find that Pilot had constructive notice of the condition. See, *e.g.*, *Hayes v. Bailey*, 80 Ill. App. 3d 1027, 1030 (1980); *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 30; *Tomczak*, 315 Ill. App. 3d at 1039-41.

¶ 52    As the Illinois case law and facts discussed above demonstrate, this was an unusual, bizarre, and unexpected event that neither the plaintiff nor anyone from Pilot had ever seen or heard of before. When taken as a whole, the evidence requires a conclusion that it was not reasonably foreseeable for Pilot to expect that a third party would take a roll of toilet paper and figure out a way to balance it on top of a restroom stall door so that the next individual who used the stall would be struck on the head by the object in some sort of prank or malicious act. Further, in line with the act not being foreseeable, there is no evidence which would give rise to a finding of constructive notice of the dangerous condition on the part of Pilot. Therefore, the factor of foreseeability favors a finding of no duty.

¶ 53                    3. Remaining Duty Factors

¶ 54    Other than foreseeability, we must also consider the three remaining factors: the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant in guarding against the injury. *Ward*, 136 Ill. 2d at 140-41. As to the likelihood of injury, individual's taking such action in an attempt to prank or harm an unsuspecting Pilot customer is highly unlikely. This is evidenced by the testimony of all the witnesses, including the expert witnesses, who stated they had never encountered this type of event before in their lives. Further, a toilet paper roll is not a dangerous object in itself and is not an object that one would anticipate being used in a way that could result in harm to someone.

¶ 55    The magnitude of the burden of guarding against the injury is high. In order to ensure that this did not occur again, Pilot would be forced to retain employees to act as restroom monitors so that the happenings inside of the restroom could be observed continuously throughout all hours of operation of the store. Additionally, Pilot would have to have employees readily available throughout its store to guard against other pranks and third party acts which may injure other patrons.

¶ 56    The consequences of placing such a burden on Pilot would be substantial. Defendants such as Pilot may cease to have restrooms that are open to the public or may limit access. If they do offer public restrooms, the privacy patrons enjoy in the restroom would be infringed upon by employees monitoring the restrooms. The modern conveniences customers experience would be restricted. Facilities offered by defendants may be withheld, limited, or made more difficult to access.

¶ 57              4. Analysis Under *Marshall v. Burger King*

¶ 58    We recognize our supreme court in *Marshall*, 222 Ill. 2d at 436-41, articulated the duty analysis by first finding a duty of reasonable care based upon the special relationship of business invitor and invitee and then analyzing the duty factors to determine whether an "exemption" to the duty exists. Prior cases use the duty factors to determine whether a duty exists, rather than identifying the duty factors as exemptions. See, *e.g.*, *Ward*, 136 Ill. 2d at

- 14 -

140-41 (factors that are relevant to the existence of a duty include foreseeability, likelihood of injury, magnitude of the burden of guarding against it, and the consequences of placing that burden upon the defendant).[2] Whether we employ a *Ward* analysis, using the factors to determine whether a duty exists, or a *Marshall* analysis, using the duty factors as exemptions to the general duty rule, our conclusion is the same. As explained above, the unforeseeability and unlikelihood of the injury sustained by the plaintiff, as well as the magnitude of the burden of guarding against it, leads to the conclusion that no duty exists under a *Ward* analysis, in the same way it would lead us to conclude that an "exemption" exists to the duty of care owed by Pilot under the *Marshall* analysis.

¶ 59 Ultimately, the facts, when considered as a whole, do not support the finding of a duty on the part of Pilot. As the plaintiff states in her opening brief on appeal,

"Simply put, no reasonable person entering a restroom stall would do so with the expectation that a large roll of industrial-sized toilet paper would be placed on top of the stall door, or that she was exposed to the risk of being struck by a large roll of toilet paper falling from overhead as she opened the restroom stall door."

In the same vein, no reasonable defendant would expect such a situation to occur. Given all of the above, we cannot find that Pilot owed a duty to the plaintiff to prevent a third party from stealing a roll of toilet paper and using it to booby trap one of its restroom stalls in an attempt to prank or hurt someone, without some type of previous instance occurring or some sort of notice to the defendant of the condition.

¶ 60                                5. Pilot's Other Arguments

¶ 61 Because we have found that Pilot owed no duty to the plaintiff, we need not address the issue of whether the toilet paper roll on top of the restroom stall door constituted a condition that was open and obvious. Further, because there is no duty, we need not address the issue of whether Pilot's failure to inspect the restrooms on an hourly basis was the proximate cause of the plaintiff's injuries. Because the record does not support a finding of duty on the part of Pilot to protect the plaintiff from the injuries she sustained, the trial court erred when it denied Pilot's motion for a judgment *n.o.v.* on the plaintiff's negligence claim.

¶ 62                                B. *Res Ipsa Loquitur*

¶ 63 Count II of the amended complaint alleges a cause of action against Pilot based on *res ipsa loquitur*. When analyzing a claim where the doctrine of *res ipsa loquitur* has been invoked, the trial court must first decide whether the doctrine applies at all. *Taylor v. City of Beardstown*, 142 Ill. App. 3d 584, 592-93 (1986). The doctrine will not apply unless a duty of care is owed by the defendant to the plaintiff. *Id.* at 593. It is important to note that

"rather than being a separate legal theory, *res ipsa loquitur* is simply 'a type of circumstantial evidence which permits the trier of fact to infer negligence when the precise cause of injury is not known.' [Citation.] Thus, because *res ipsa loquitur* is merely an alternate method of proving negligence, no cause of action can lie under the

---

[2]We note that *Marshall* in no way explicitly overrules *Ward* or any case that applies the duty analysis in the manner that the *Ward* court did. In fact, the *Marshall* court did not explain why it was deviating from its previous method of analysis. See *Marshall*, 222 Ill. 2d at 429-42.

doctrine unless a duty of care is owed by the defendant to the plaintiff." *Beattie v. Lindelof*, 262 Ill. App. 3d 372, 381 (1994).

Here, because Pilot owes no duty to the plaintiff, the plaintiff's *res ipsa loquitur* count is not a viable form of relief.

¶ 64                                    III. CONCLUSION

¶ 65        For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed, and the matter is remanded with directions that the circuit court enter judgment *n.o.v.* in favor of the defendant.

¶ 66        Reversed and remanded with directions.

¶ 67        JUSTICE WHARTON, dissenting:

¶ 68        I respectfully dissent. For the reasons that follow, I believe my colleagues give too little weight to the significance of the recognized special relationship that existed between the parties. I also believe that in finding that the plaintiff's injuries were not foreseeable, they incorrectly focused on the precise manner in which she was injured rather than the " 'general character' " of the harm. See *Marshall*, 222 Ill. 2d at 442 (quoting *Bigbee v. Pacific Telephone & Telegraph Co.*, 665 P.2d 947, 952 (Cal. 1983)). In addition, I believe my colleagues have conflated the concepts of duty and breach, something our supreme court cautioned against in the seminal case of *Marshall*. In so doing, I believe they have created an overly broad exemption from the duty a business invitor owes its invitees, something the supreme court also cautioned against in *Marshall*.

¶ 69        As my colleagues correctly observe, the key question in determining the existence of a duty is "whether defendant and plaintiff stand in such a relationship to one another that the law imposes on defendant an obligation of reasonable conduct for the benefit of plaintiff." (Internal quotation marks omitted.) *Osborne*, 312 Ill. App. 3d at 146-47; see also *Marshall*, 222 Ill. 2d at 436. The relationship of business invitor and invitee is one of the four special relationships that Illinois law recognizes as imposing a duty to warn or protect from harm. See *Marshall*, 222 Ill. 2d at 438-39 (citing Restatement (Second) of Torts § 314A (1965)). Here, Pilot denied in its pleadings that the plaintiff was its business invitee. However, it did not pursue that assertion at trial, and it does not argue on appeal that the invitor-invitee relationship did not exist. For these reasons, my colleagues assume the existence of this special relationship for purposes of their analysis.

¶ 70        Despite this assumption, the majority expresses doubt that the plaintiff could establish the existence of a business invitor-invitee relationship. I disagree. I note that the presence of a Denny's restaurant on Pilot's premises clearly serves business purposes. Patrons who stop to eat in the restaurant must go through Pilot's store to use the restrooms. In doing so, they may decide to purchase items there. Moreover, many travelers are more likely to stop at a facility where they can eat a meal and purchase gas in one stop. Obviously, a restaurant cannot operate without its employees. Thus, the plaintiff was on Pilot's premises for business purposes regardless of whether she personally shopped in Pilot's convenience store. See *Hills*, 195 Ill. 2d at 250-51 (explaining that the key question is whether an invitee is present on the premises for business purposes, as stated in section 344 of the Restatement (Second) of Torts, not

- 16 -

whether there is a direct pecuniary benefit to the invitor). I therefore believe that the record is adequate to establish a business invitor-invitee relationship between the parties.

¶ 71     It is important to consider the nature of the duty that arises by virtue of that recognized special relationship. Under both *Marshall* and section 344 of the Restatement (Second) of Torts, a business invitor owes two duties to invitees on its premises. First, it has the duty to exercise reasonable care to protect its invitees from harm that may occur as a result of the negligent or intentional acts of third persons on the premises or to provide them with adequate warning of the danger of such harm. Second, a business invitor also has a duty to exercise reasonable care to " 'discover that such acts are being done or are likely to be done.' " *Marshall*, 222 Ill. 2d at 438 (quoting Restatement (Second) of Torts § 344 (1965)). As the supreme court explained in *Marshall*, section 344 "represents a specific statement of the general rule articulated in section 314A of the Restatement, and long recognized by [the supreme] court, that certain special relationships give rise to an affirmative duty to aid or protect another against unreasonable risk of physical harm." *Id.* (citing Restatement (Second) of Torts § 314A (1965)).

¶ 72     *Marshall* is still controlling law with respect to duty and the special relationship between a business invitor and invitee. It is also instructive due to its enlightening discussion of the concept of duty in general and the application of that concept in the context of the special relationship between a business invitor and its invitees. There, the plaintiff's decedent was eating at a Burger King restaurant when a driver lost control of her vehicle in the parking lot and crashed through the wall of the restaurant. The vehicle struck the decedent, causing his fatal injuries. *Id.* at 425. Burger King and its franchisee filed a motion to dismiss the plaintiff's negligence complaint. The trial court granted their motion, and the appellate court reversed that ruling. *Id.* The issue before the supreme court was whether Burger King and its franchisee owed the decedent a duty of care. *Id.*

¶ 73     The supreme court began its analysis of that question by acknowledging that a great deal of confusion exists over the concept of duty and its proper role in the law of negligence. *Id.* at 435-36. The court explained that whether a duty should be imposed is a question that turns largely on considerations of public policy. *Id.* at 436. The court further explained that "the policy considerations that inform this inquiry" are often discussed in terms of the four duty factors that my colleagues focused on in the majority opinion. *Id.* at 436-37. The court emphasized, however, that the "touchstone" of duty analysis is whether the relationship between the parties is such "that the law impose[s] upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* at 436. The court then explained that, as I have already noted, the relationship of a business invitor and its invitees is recognized by Illinois courts as a special relationship that imposes a duty of care on the invitor for the benefit of its invitees. *Id.* at 438-39.

¶ 74     The court went on to discuss the policy reasons underlying our longstanding recognition of this rule. In doing so, the court considered its prior decision in *Hills*. The issue in *Hills* was whether two Little League associations owed a duty to a coach to protect him from the criminal act of an opposing coach. *Id.* at 439 (citing *Hills*, 195 Ill. 2d at 212-13). The *Hills* court ultimately found that no such duty existed because the coach was not a business invitee. See *Hills*, 195 Ill. 2d at 251-52. Before reaching this conclusion, however, the court discussed the basis for the duty of care owed by a business invitor to its invitees. The court stated as follows:

" '[P]laces to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave, and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation.' " *Id.* at 245-46 (quoting *Feld v. Merriam*, 485 A.2d 742, 745 (Pa. 1984)).

The *Marshall* court noted that negligent acts, such as those involved in both *Marshall* and this case, are more foreseeable than criminal misconduct, such as the attack at issue in *Hills*. *Marshall*, 222 Ill. 2d at 440.

¶ 75　　What is clear from this discussion is that there are two related policy reasons underlying the duty the law imposes on a business invitor for the benefit of its invitees. First, it is inherently reasonably foreseeable that harm may result from the negligence of members of the public unless the business takes appropriate precautions to mitigate the risk of such harm. Second, the risk of such harm is created, in part, because the business opened its premises to the general public. See *id.* at 439 (explaining that when a property owner "opens his premises to the public for business purposes, he must recognize the risk that has been created"). The *Marshall* court observed that these policy considerations clearly justified the imposition of a duty of reasonable care on a business invitor to protect its invitees from the negligence of third parties on its premises. *Id.* at 441. Because the complaint in that case alleged that the decedent was the defendants' invitee, the court therefore concluded that it alleged sufficient facts to establish that the defendants owed him a duty of care. *Id.*

¶ 76　　It was only *after* reaching this conclusion that the *Marshall* court considered the four duty factors. The court explained that by referring to those four factors, the defendants in that case "essentially asked [the court] to create an exemption from the duty of care that stems from the special relationship between a business invitor and invitee." *Id.*; see also *Nelson v. Aurora Equipment Co.*, 391 Ill. App. 3d 1036, 1039 (2009). The court considered the four duty factors and found that they did not provide a sound public policy basis for creating such an exemption. *Marshall*, 222 Ill. 2d at 437, 441.

¶ 77　　The court first considered the reasonable foreseeability of the harm and the likelihood of the injury. The court emphasized that it is the " 'general character' " of the harm that must be foreseeable, " 'not its precise nature or manner of occurrence.' " *Id.* at 442 (quoting *Bigbee*, 665 P.2d at 952). With this standard in mind, the court found that, "given the pervasiveness of automobiles" in modern society, it was reasonably foreseeable that a business invitee might be placed at risk due to automobile-related negligence. *Id.* The court also found that likelihood of injury from such incidents was high. *Id.*

¶ 78　　The court rejected the defendants' argument that comment f to section 344 of the Restatement (Second) of Torts supported a finding that they owed the decedent no duty. Comment f states that, because a property owner "is not an insurer of the visitor's safety," the duty to exercise reasonable care on behalf of a business invitee exists only when the invitor has reason to know that third persons are likely to engage in conduct that is likely to endanger the safety of invitees. Restatement (Second) of Torts § 344 cmt. f, at 225 (1965). The comment further states that a business owner might have reason to know such conduct is reasonably likely either based on past experience or because "the place or character of [the] business *** is such that he should reasonably anticipate careless or criminal conduct on the part of third persons." *Id.* at 226. The defendants in *Marshall* argued that, pursuant to these principles, the

harm to the decedent was not foreseeable because they had no notice of any prior similar incidents. *Marshall*, 222 Ill. 2d at 444.

¶ 79    The supreme court rejected this argument, finding that the "plaintiff's complaint clearly [fell] within [the] purview" of comment f. *Id.* at 445. The court pointed out that the complaint alleged that the defendants were aware that their restaurant was located in an area with a high volume of traffic and that aspects of the building's design made it susceptible to out-of-control vehicles. *Id.* at 445-46. The supreme court explained that these allegations were, in essence, allegations that, based on the place and character of their business, the defendants had reason to anticipate that the negligent conduct of third persons was reasonably likely to pose a danger to its customers. *Id.* at 445.

¶ 80    The court next considered the defendants' arguments concerning the magnitude of the burden of guarding against vehicle-related injuries and the consequences of placing that burden on the defendants. The defendants argued that the protective measures necessary to protect invitees from out-of-control vehicles would impose an enormous financial burden on businesses and result in buildings that were "less aesthetically pleasing." *Id.* at 443. The supreme court rejected these arguments, finding them to be "speculative at best." *Id.* at 442.

¶ 81    More importantly for purposes of this appeal, the court also noted that the defendants' arguments were "based on mistaken assumptions about the nature of a duty of care." *Id.* at 443. The court explained, "Recognizing that the duty of reasonable care that businesses owe to their invitees applies to cases where invitees are injured by out-of-control automobiles is not the same as concluding the duty has been breached because a business failed to take a certain level of precaution." *Id.* The court emphasized that the duty owed by the defendants to the decedent, as their business invitee, was simply a duty of reasonable care. *Id.* The court explained that the question was not whether they had a duty to install protective poles or take any other specific precautions; rather, the question was whether, in light of the particular facts of the case, the defendants breached their duty of reasonable care. *Id.* at 443-44. The court stated, "It is inadvisable for courts to conflate the concepts of duty and breach in this manner." *Id.* at 443.

¶ 82    Because *Marshall* involved an appeal from a ruling on a motion to dismiss, the court noted that the question of whether the defendants breached their duty of reasonable care could not be answered at that stage in the proceedings. *Id.* at 444. By contrast, this case was tried to verdict, so that question can be answered here. Nevertheless, that is not the only reason the *Marshall* court found it to be "inadvisable for courts to conflate the concepts of duty and breach." See *id.* at 443. The court also emphasized that no-duty rules " 'can easily be made too broad or too narrow.' " *Id.* at 441-42 (quoting 1 Dan B. Dobbs, The Law of Torts § 227, at 579 (2001)). Quoting from Dobbs's treatise on tort law, the court explained that because no-duty rules are " 'rules of law, not decisions about particular cases, they cover all cases in the category to which they are addressed. *** Consequently, no-duty rules should be invoked only when all cases they cover fall substantially within the policy that frees the defendant of liability.' " *Id.* at 442 (quoting Dobbs, *supra*, at 579). In this case, I believe that the majority opinion conflates the concepts of duty and breach and, in doing so, draws a broad no-duty rule in contravention of the *Marshall* court's advice to the contrary.

¶ 83    In addressing the first duty factor—the reasonable foreseeability of the harm—the majority concludes "that it was not reasonably foreseeable that a third party would obtain a roll of toilet paper and balance it on top of a restroom stall door so as to booby trap the entryway into the stall in some sort of prank or intentional attack upon the plaintiff." *Supra* ¶ 45. As our supreme

court explained in *Marshall*, however, while " 'the general character of the event or harm' " must be reasonably foreseeable, it is not necessary that the " 'precise nature or manner of occurrence' " likewise be foreseeable. *Marshall*, 222 Ill. 2d at 442 (quoting *Bigbee*, 665 P.2d at 952). Thus, the question is not whether it was reasonably foreseeable that a travel plaza patron would place a roll of toilet paper in the precise location the plaintiff's expert believed the roll was placed in this case. Rather, the question is whether it was reasonably foreseeable that a patron might place a toilet paper roll anywhere it might pose a risk to other patrons or otherwise cause a dangerous condition in the restrooms. Although the evidence on that question in the record before us is not overwhelming, I believe it is adequate to support the trial court's apparent conclusion that the plaintiff's injury was reasonably foreseeable.

¶ 84 I reach this conclusion for two reasons. First, the record contains evidence that Pilot was aware that dangerous conditions had been present in its restrooms on prior occasions and evidence that Pilot was also aware that patrons frequently removed toilet paper rolls and left them in places they did not belong. Although she was not asked to elaborate, Pilot's general manager, Jamie Abbott, testified that she was "absolutely" aware of dangerous conditions in Pilot's restrooms in the past. Likewise, the custodian, Robert Sayles, testified that it was "common" for patrons to remove toilet paper rolls from their dispensers. He further testified that he had observed toilet paper rolls on the counters, the floor, and the backs of toilets. I acknowledge that, although the plaintiff testified that she saw a roll of toilet paper on top of the dividing wall between two stalls, there was no evidence that Pilot was made aware of this incident or any other instances of a toilet paper roll being left someplace high. Nevertheless, I believe the knowledge that Pilot clearly did have was sufficient to make it reasonably foreseeable to Pilot that a patron might be injured due to a misplaced industrial-sized toilet paper roll or some other dangerous condition caused by the carelessness of another patron.

¶ 85 Second, the record also contains evidence that the character of Pilot's business is such that Pilot reasonably should have anticipated such careless conduct on the part of some of its patrons. See *id.* at 444 (citing Restatement (Second) of Torts § 344 cmt. f, at 226 (1965)). There was testimony that more than 2500 people used Pilot's restrooms each day. Our supreme court has found the risk of third-party negligence to be inherently foreseeable when premises are open to the general public for business purposes (see *id.* at 439; *Hills*, 195 Ill. 2d at 245-46), and this volume of use obviously magnifies that inherent risk. The risk is further magnified by the fact that not only adults but also children and teenagers had easy access to the custodian's cart. Teenagers are particularly likely to engage in pranks or careless acts.

¶ 86 At this point, it is worth emphasizing that, under our supreme court's holding in *Marshall*, the no-duty rule created by the majority is an exemption from the duty that Pilot otherwise owes its invitees. For the reasons I have discussed, I find that the incident that led to the plaintiff's injury was reasonably foreseeable. However, even if I agreed that the incident was not foreseeable enough to justify the imposition of a duty absent a special relationship, I would not find it to be so unforeseeable that it justifies an exemption from the duty that otherwise exists because the parties in this case do have a recognized special relationship.

¶ 87 I likewise disagree with my colleagues' conclusions regarding the three remaining duty factors. First, I do not believe the risk of injury is low enough to warrant an exemption from the duty Pilot owed its invitees. While I agree with my colleagues that a roll of toilet paper— even an industrial-sized roll weighing nearly two pounds—is not an inherently dangerous object, the risk is not negligible. A misplaced roll could easily fall and strike a patron, as

- 20 -

occurred in this case. The plaintiff's injury in this case was not minor; it involved two herniated discs requiring a surgical procedure. A misplaced roll of toilet paper could also easily fall on the floor and pose a risk of tripping.

¶ 88 Second, I believe my colleagues' analysis of the magnitude of guarding against the harm and the consequences of placing that burden on Pilot conflates the concepts of duty and breach. In finding the magnitude of the burden to be high, the majority posits that requiring Pilot to take reasonable precautions to guard against the harm would force it "to retain employees to act as restroom monitors" and to post additional employees "throughout [the] store to guard against other pranks and third party acts which may injure other patrons." *Supra* ¶ 55. As our supreme court explained in *Marshall*, however, "[r]ecognizing that the duty of reasonable care" applies to the circumstances of the case "is not the same as concluding [that] the duty has been breached because a business failed to take a certain level of precaution." *Marshall*, 222 Ill. 2d at 443.

¶ 89 Similarly, in finding the consequences of placing the burden on Pilot to be substantial, my colleagues predict that if businesses like Pilot are not exempted from their duty to protect their invitees from the negligent acts of other patrons, they might stop offering public restrooms altogether or infringe on the privacy of patrons by hiring employees to act as restroom monitors. I believe these dire predictions are highly speculative. See *id.* at 442 (rejecting similar claims about the level of safety precautions needed to avoid liability). They are also based on a presumption that jurors will always find a breach unless a business takes the somewhat extreme measures set forth in the majority opinion. As the supreme court explained in *Marshall*, however, "merely concluding that the duty applies does not constitute an automatic, broad-based declaration of negligence liability." *Id.* at 443.

¶ 90 Finally, I note that, as my colleagues explained, " 'the concept of duty' " is " 'complex and indeed nebulous.' " *Id.* at 435 (quoting *Mieher*, 54 Ill. 2d at 545); *Ward*, 136 Ill. 2d at 140. As my colleagues also explained, the question of whether a duty exists "involves considerations of public policy." *Marshall*, 222 Ill. 2d at 436; see also *Osborne*, 312 Ill. App. 3d at 146-47. Public policy considerations weigh in favor of imposing upon businesses such as Pilot an obligation to take reasonable precautions to provide restrooms that are clean and safe for employees and members of the public alike.

¶ 91 My evaluation of the four duty factors leads me to conclude that there is no sound policy basis for exempting Pilot from its duty to take reasonable precautions to protect its invitees from the negligent acts of other patrons. I would therefore hold that Pilot owed the plaintiff a duty of care.

¶ 92 Because my colleagues found that Pilot did not owe the plaintiff a duty of care, they did not need to determine whether the plaintiff satisfied the other elements of a cause of action for negligence. They also did not need to address the question of whether the toilet paper roll constituted an open and obvious danger. I address these issues briefly.

¶ 93 As stated earlier by my colleagues, the essential elements in a negligence claim are the existence of a duty of care, a breach of that duty, and an injury that was proximately caused by the defendant's breach of its duty. *Ward*, 136 Ill. 2d at 140. Although the existence of a duty is a question of law to be decided by the court, breach and proximate cause are factual matters to be decided by the jury. *Marshall*, 222 Ill. 2d at 430. In this case, a jury found that the plaintiff proved her case with respect to those elements, and Pilot moved for a judgment *n.o.v.* A motion for a judgment *n.o.v.* should be entered only if "all of the evidence, when viewed in its aspect

most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). Applying that standard to the evidence in this case, I believe the trial court properly denied Pilot's motion.

¶ 94 The record contains ample evidence to support the jury's finding that Pilot breached its duty of reasonable care. There is no dispute that the restroom had not been serviced in over five hours. Servicing the restrooms of a busy travel plaza more frequently would have been a reasonable precaution. In fact, Pilot acknowledged that it was in violation of its own policy to service the restrooms once every hour. Although this fact is not dispositive, it shows that there were reasonable steps Pilot could have taken in the exercise of reasonable care. In addition, Pilot could have used a custodian's cart that allowed it to better secure the toilet paper and other cleaning supplies.

¶ 95 Furthermore, I reiterate that the duty of a business invitor to its invitees includes an obligation to take reasonable steps to discover that third parties are engaging in negligent or intentional acts on its premises that might pose a risk. See *Marshall*, 222 Ill. 2d at 438 (citing Restatement (Second) of Torts § 344 (1965)). The record contains substantial evidence that Pilot breached this aspect of its duty. Sayles's testimony makes clear that Pilot relied on its patrons to alert its staff to dangerous or unsanitary conditions in the restroom. He testified that customer complaints about the conditions of the restrooms were common. He further testified that on the night the plaintiff was injured, he had not yet serviced the women's restroom because he had other pressing duties to attend to and no one had complained about that restroom. When the plaintiff was injured, Sayles was cleaning the men's room. He described the condition of the men's room as "horrible." He noted that there was urine to clean up. It is significant that no Pilot employee was aware of these conditions until a patron complained.

¶ 96 The record also contains undisputed evidence that the plaintiff was injured as a result of the roll striking her. The plaintiff's orthopedic surgeon, Dr. Gornet, testified that the plaintiff's cervical disc herniation and resultant surgery were causally connected to the accident. He further testified to the reasonable and customary charges for the plaintiff's related medical expenses, past and future. The plaintiff was awarded $560,563.68. Of that amount, $407,441 was based on Dr. Gornet's testimony.

¶ 97 The evidence that Pilot's breach of its duty of care was the proximate cause of the plaintiff's injury was sufficient to support the jury's verdict. A defendant's breach of its duty is the proximate cause of a plaintiff's injury if the injury is "the natural and probable result" of the defendant's negligent acts or omissions and the injury is reasonably foreseeable. *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366, 380 (1943). As I have already discussed, the injury was reasonably foreseeable. Further, Pilot's failure to service the restrooms for over five hours made the plaintiff's injury "natural and probable" in two ways. First, it made it more likely that stalls would run out of toilet paper, thereby making it more likely that patrons might remove rolls from the cart or from other stalls. Second, it made it more likely that Pilot would fail to discover misplaced rolls and remedy the situation.

¶ 98 Pilot argues, however, that servicing the restroom more frequently would not have prevented the plaintiff's injury because the evidence suggested that the toilet paper roll had not been in place for more than a short period of time. In support of this claim, Pilot relies on testimony opining that it was unlikely for the stall to have been unoccupied for more than an hour. However, this evidence is speculative. Indeed, there was no evidence that any of Pilot's

employees checked the restroom at all during the five-hour period at issue. I do not find that the evidence as a whole so overwhelmingly favors Pilot on the questions of breach and proximate cause that the jury's verdict in favor of the plaintiff cannot stand.

¶ 99    I likewise do not believe that a judgment *n.o.v.* would have been proper based on Pilot's contention that the toilet paper roll constituted an open and obvious danger. The plaintiff acknowledged on cross-examination that she believed she likely would have seen the roll had she been looking up when she entered the stall. However, her expert witness opined that the roll would not have been easy to see. Moreover, people do not typically look up when entering the stall in a public restroom. Thus, I would not find as a matter of law that the roll constituted an open and obvious danger.

¶ 100    For these reasons, I conclude that the court properly refused to enter judgment *n.o.v.* in favor of Pilot. I would therefore affirm the judgment of the trial court.